UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

MAXIE DACOSTA,

Plaintiff,

– against –

THE CITY OF NEW YORK, DETECTIVE
DAVID SHAPIRO, Shield #6054, and
POLICE OFFICERS JOHN AND JANE DOE
#1 THROUGH 20, individually and in their
official capacities

Defendants.

MEMORANDUM AND ORDER ON
PLAINTIFF'S MOTION FOR LEAVE TO
AMEND HIS COMPLAINT

15-CV-5174

| Parties | Appearances |
|---------|-------------|
| Maxie DaCosta | **Kim Richman**<br>**Clark A. Binkley**<br>**Javier Osvaldo Hidalgo**<br>The Richman Law Group<br>81 Prospect Street<br>Brooklyn, NY 11201<br>(212)687-8291<br>Fax: (718)228-8522<br>krichman@richmanlawgroup.com |
| The City of New York<br>Det. David Shapiro | **Kavin Suresh Thadani**<br>**Daniel G. Saavedra**<br>New York City Law Department<br>Special Federal Litigation Division<br>100 Church Street<br>New York, NY 10007<br>212-356-3534<br>Fax: 212-356-3509<br>kthadani@law.nyc.gov |
| P.O.'s John and Jane Doe # 1<br>through # 20 | |

1

**Jack B. Weinstein, Senior United States District Judge:**

## Table of Contents

I.    Introduction .................................................................................................. 3

II.    Facts .......................................................................................................... 4

III.    Procedural History .................................................................................... 6

IV.    Law ........................................................................................................... 7

    A.    Standard of Review from Objections to Magistrate Judge's Report and
Recommendations .................................................................................. 7

    B.    Statute of Limitations ............................................................................ 9

    C.    Motion for Leave to Amend a Pleading .............................................. 16

    D.    Relation Back ....................................................................................... 16

      1)    Federal Rule 15(c)(1)(A) .............................................................. 17

        a)    New York CPLR 1024 .............................................................. 17

        b)    New York CPLR 203 ................................................................ 18

      2)    Federal Rule 15(c)(1)(C) .............................................................. 28

    E.    Disclosure Obligations ......................................................................... 35

    F.    Particular Need for Discovery in Police Civil Rights Cases ................ 37

    G.    Ethical Obligations of Government Counsel ........................................ 43

V.    Application of Law to Facts ..................................................................... 50

    A.    Ethical Obligations of Counsel ............................................................ 50

    B.    Leave to Amend Under Federal Rules 15 and 16 ................................................. 54

    C.    Relation Back Under Federal Rule 15(c)(1)(A).................................................... 54

    D.    Relation Back Under Federal Rule 15(c)(1)(C).................................................... 55

VI.    Conclusion ............................................................................................................ 57

## I.    Introduction

Two legal issues are central to this civil rights opinion:  first, is it ethical for a government defense attorney to fail to correct plaintiff's counsel's misconception about the proper defendant; and second, should the relation back of an amendment adding a new defendant be allowed *nunc pro tunc* to avoid a statute of limitations defense pursuant to the standards of the Supreme Court and the New York Court of Appeals rather than the more rigid standards sometimes applied in cases decided in the Second Circuit.  The answer to the first question is "no," such a practice of holding back the identity of the proper defendant is neither ethical nor allowed in the Eastern District of New York under local and national rules.  And to the second, "yes," the more flexible standards of the two highest courts allow a *nunc pro tunc* amendment avoiding the statute of limitations.

Plaintiff has alleged serious civil rights violations by a New York City police officer.  He filed suit the day before the expiration of the statute of limitations naming the wrong police officer in his complaint about his prosecution for robbery.  The City's attorney representing the named officer possessed, or should have possessed, knowledge about which police officer was involved in the investigation leading to Plaintiff's prosecution for robbery.  When Plaintiff finally learned the name of the officer who was responsible for the alleged harm, the attorney for the City claimed it was too late to amend the complaint to name the proper party.

Plaintiff's amended complaint naming the proper police officer is allowed, with a relation back to the time the original complaint was filed. Defendants' motion for summary judgement on the grounds of a statute of limitations defense is denied.

## II.    Facts

Plaintiff was accused of three crimes in 2007:  homicide, escape, and robbery.  He was acquitted of the homicide and escape by a jury, and the robbery charge was shortly after dismissed.  This suit is based primarily on a theory that the police lacked probable cause to bring charges and prosecute Plaintiff for the robbery.

The homicide and escape charges are unrelated to the robbery.  Oct. 23, 2017 Hr'g Tr. 12:12-20.  Plaintiff was accused of committing a murder on July 28, 2007, *id.* 16:12-20, and it was alleged that while in custody for the homicide charge, Plaintiff, while under the supervision of Detective David Shapiro, escaped from the police precinct, *id*. 9:25-10:6.  Eventually, Plaintiff was sent to jail on the homicide and escape charges.  *Id.* 16:12-17:8; Am. Compl. ¶ 12.

The robbery charge that forms the basis of the present civil suit is based on a different set of facts.  On the evening of July 28, 2007, an armed man entered a retail sports store, threatened and assaulted employees, and forcibly removed $4,600 from the cash register.  Plaintiff's Response to Defendants' Statement Pursuant to Local Rule 56.1 ("56.1 Stmt.") at ¶ 1, ECF No. 65.

About a month later, on August 29, 2007, one of the robbery victims, Mohammad Sarwar, was watching the news on television and saw a picture of Plaintiff on a wanted poster related to the homicide and escape accusations.  *Id.* at ¶¶ 2, 3.  Mr. Sarwar believed that Plaintiff was the person who robbed the store the previous month; he contacted the 106th Precinct Detective Squad.  *Id.*

A day later, he met with Detective Fortunato Tranchina, the lead detective responsible for investigating the robbery. *Id.* at ¶¶ 4-5. Mr. Sarwar was shown a photo array at the precinct and again identified Plaintiff. *Id.* at ¶ 7. The photo array contained a photograph from the wanted poster that Mr. Sarwar had seen the day earlier—the same photograph that prompted him to come forward to the police. *Id.* Two other eyewitness-victims of the robbery were also there, Anita Saunders and James Cadawan. *Id.* They had seen the same wanted poster that Mr. Sarwar saw the prior day, but they expressed some uncertainty about whether Plaintiff was the perpetrator of the robbery. *Id.*

On March 11, 2008, Mr. Sarwar, Ms. Saunders, and Mr. Cadawan returned to the precinct to view a lineup. *Id.* at ¶ 8. Mr. Sarwar identified Plaintiff as the guilty person. *Id.* Ms. Saunders and Mr. Cadawan viewed the lineup, but did not identify Plaintiff. *Id.* Ms. Saunders identified a different person with 80% confidence and Mr. Cadawan told the police that he did not recognize any of the people in the lineup. *Id.*

On April 24, 2008, Detective Tranchina arrested Plaintiff, who was already in jail on the other charges—homicide and escape—and signed a criminal court complaint charging him with two counts of Robbery in the First Degree. *Id.* at ¶¶ 9, 11. Plaintiff was, on May 15, 2008, indicted by a Grand Jury for one count of Robbery in the First Degree, one count of Robbery in the Second Degree, two counts of Assault in the Second Degree and one count of Criminal Possession of a Weapon (in the robbery) in the Fourth Degree. *Id.* at ¶ 13. On September 3, 2008, a criminal court judge determined that the indictment was not defective. *Id.* at ¶¶ 14-15.

After spending several years in jail on the robbery, homicide, and escape charges, Plaintiff was tried and acquitted of the homicide and escape. Am. Compl. ¶ 22. That same day

he was released from jail on his own recognizance.  *Id*. at ¶ 23.  A month later, on September 6, 2012, the robbery charges were dismissed.  *Id*. at ¶ 13.

Detective Tranchina was the lead detective on the robbery case, which forms the basis of this lawsuit.  Plaintiff and his counsel were under the mistaken notion that Detective Shapiro, the officer who was involved in the murder investigation, and from whose custody Plaintiff allegedly escaped, was in charge of the robbery investigation.  *See* Compl.  Plaintiff filed suit on this assumption, and named as defendants Detective Shapiro along with twenty John and Jane Doe officers.  *Id*.

Plaintiff believed that Shapiro had orchestrated his arrest for the robbery as payback for his alleged escape.  Oct. 23, 2017 Hr'g. Tr. 9:16-10:13.  In discovery, Plaintiff found no evidence that this theory was true, but learned of the extensive involvement of Detective Tranchina in the robbery prosecution.  *Id.*

## III.    Procedural History

Plaintiff filed suit on September 5, 2015.  *See* Compl.  As amended, the complaint asserts claims under 42 U.S.C. § 1983 for deprivation of federal civil rights, malicious abuse of process, malicious prosecution, municipal liability, and a claim for intentional infliction of emotional distress under New York state law.  *See* Am. Compl. at 5-10.  The original complaint named The City of New York, David Shapiro, a detective, and twenty John and Jane Doe defendants.  *See* Compl. at 1.

On February 26, 2016, Defendants filed a motion to dismiss the action for failure to state a claim.  Plaintiff then amended his complaint on March 18, 2016, mooting the motion to dismiss.  *See* April 19, 2016 Order, ECF No. 21.  On June 3, 2016, Defendants answered Plaintiff's First Amended Complaint.  *See* Answer, ECF. No. 25.

After engaging in discovery, on January 9, 2017, Plaintiff filed a motion to amend his complaint for a second time to add a new defendant, Detective Tranchina, determined in discovery to have been the lead detective in the robbery prosecution at the heart of the instant case.  *See* Pl.'s Mot. Am., EFC No. 46.  Defendants opposed the motion on the ground that the statute of limitations had run and that the amended pleading did not relate back to the filing of the original complaint.  *See* Defs.' Opp'n Am., ECF No. 47.

Magistrate judge Mann agreed with Defendants.  She issued a Report and Recommendation on February 10, 2017 recommending that Plaintiff's motion to amend his pleadings and add Detective Tranchina be denied.  *See* R. & R., ECF. No. 59.

For the reasons indicated below, the statute of limitations does not bar the suit.  Relation back is permitted.  The report of the magistrate judge recommending denial of permission to amend is reversed.

## IV.  Law

### A.  Standard of Review from Objections to Magistrate Judge's Report and Recommendations

The magistrate judge issued a Report and Recommendation on the issue of whether Plaintiff should be granted leave to amend his complaint and whether that amendment relates back to the original pleading.  Although this is a Report and Recommendation on a motion to amend a pleading, the magistrate judge recognized that it was effectively a dispositive motion because denial would "foreclose plaintiff's potential claims against Tranchina."  R. & R. at 2 n.2, ECF. No. 59.

Since this report is dispositive of Plaintiff's claims, the court reviews it *de novo*.  *See* Fed. R. Civ. P. 72(b); *Covington v. Kid*, No. 94 CIV. 4234 (WHP), 1999 WL 9835, at *2 (S.D.N.Y.

Jan. 7, 1999) ("A dispositive matter is one that disposes of, or terminates, a claim or defense. Because Magistrate Judge Peck's order denying Plaintiff leave to amend the complaint foreclosed the potential claims against P.O. Lorenzo and Lt. Ahearn, it was dispositive.").

A party has fourteen days to object to a Report and Recommendation. Fed. R. Civ. P. 72. Plaintiff did not file an objection. *But see Grassia v. Scully*, 892 F.2d 16, 19 (2d Cir. 1989) ("[T]he district court is not bound by the recommendation of the magistrate."). The court has discretion to conduct *de novo* review even without receiving objections within the allotted fourteen-day window. *See United States v. Male Juvenile (95-CR-1074)*, 121 F.3d 34, 39 (2d Cir. 1997) ("Although defendant did not object to the magistrate judge's recommendation . . . [t]he record indicates that the district court made a *de novo* determination of the Report and Recommendation . . . . The court's review was well within its discretion.").

While a failure to timely object may at times lead to a waiver of a right to review, the court here reviews *de novo* because of the serious ethical and other considerations that were revealed by Defendants' summary judgment motion. The parties have long been on notice that the court was considering this issue. On March 7, 2017 the court informed the parties that it would hear argument on Plaintiff's motion seeking to amend his complaint along with Defendants' motion for summary judgement. *See* Mar. 7, 2017 Order, EFC No. 62. In a later scheduling order the court informed Defendants that "[c]ounsel for the defendants, the defendants, and prospective defendants may be questioned about their litigation conduct in failing to bring plaintiff's counsel's error to the timely attention of plaintiff's counsel, if that was a failure." May 17, 2017 Order, ECF No. 71.

### B.  Statute of Limitations

As in the case of many federal substantive statutes, Congress did not establish a statute of limitations for civil rights actions brought pursuant to 42 U.S.C. § 1983.  *Bd. of Regents v. Tomanio,* 446 U.S. 478, 483 (1980).  Consequently, federal courts are sometimes driven to "borrow" state statutes of limitations.  *Johnson v. Ry. Exp. Agency, Inc.*, 421 U.S. 454, 462 (1975) (citing cases).  Section 1988 instructs district courts to follow

> the laws of the United States, so far as such laws are suitable to carry [the provisions of Section 1983] into effect; but in all cases where they are not adapted to the object, or are deficient in the provisions necessary to furnish suitable remedies and punish offenses against law, *the common law, as modified and changed by the constitution and statutes of the State wherein the court having jurisdiction of such civil or criminal cause is held, so far as the same is not inconsistent with the Constitution and laws of the United States,* shall be extended to and govern the said courts in the trial and disposition of the cause . . .

42 U.S.C. § 1988 (emphasis added).

The state statute to be borrowed should not be selected arbitrarily; the limitations period for "the prosecution of a closely analogous claim" must be chosen because "a federal court is relying on the State's wisdom in setting a limit" for when the action may be brought, which "inevitably reflect a value judgment concerning the point at which the interests in favor of protecting valid claims are outweighed by the interests in prohibiting the prosecution of stale ones."  *Johnson*, 421 U.S. at 463-64.

The statutes should be adopted with at least some state interpretative nuances.  To properly apply a statute of limitation, it is necessary to understand the purposes underlying it.  The purposes underlying statutes of limitation of the state of New York is as follows:

> Statutes of limitation are essentially creatures of the legislative rather than of the judicial process.  Although isolated instances of time limitations upon the institution of suits existed prior to the seventeenth century, the genesis of modern comprehensive prescription of time limitations is generally ascribed to the English Limitation Act of 1623.

Statutes of limitation are among the more anomalous creatures of the law. They often operate arbitrarily upon passage of the specified period of time to bar justified as well as unjustified claims, and typically apply whether the delay in bringing suit was justifiable or, indeed, could have been avoided at all. They represent a legislative judgment that such occasional hardship is outweighed by the advantages of barring stale claims.

A number of interrelated policy considerations are advanced as the "advantages" that outweigh these occasional hardships.

Perhaps most fundamental, certainly most deeply rooted in the "instinct of men," are the considerations that underlie the common appellation of limitation statutes as "statutes of repose."

It seems harsh that misdeeds and obligations perhaps long forgotten should remain a source of uncertainty and concern, if those harmed do not seek vindication within a reasonable time. Expectation are developed., with the passage of time, that the slate has been wiped clean of ancient obligations, or even that they have been forgiven, and it is not unreasonable to seek security to mold one's affairs in the light of these expectations. So long as the injured person is given a reasonable time and opportunity to seek any desired redress for personal grievance, and is aware of the bar by the passage of time, concern for that person need not conflict with this policy of repose.

The policy consideration most frequently articulated by courts, however, and the one that has had the greatest effect in shaping the law of limitations, concerns the effect of the passage of time upon the availability and reliability of evidence, and the consequent prejudice to fair and accurate determination of factual disputes. Fairness to the defendant is primarily stressed, but concern for the effectiveness of judicial machinery is also apparent.

Less often articulated, but certainly a related element of justification for time limitations, is the experiential knowledge that meritorious claims will usually be pressed within a reasonable period of time, which leads to a presumption of sorts that the probability of merit is less in a stale than a fresh claim. An English judge may have had the probability, as well as the policy of repose in mind, in stating that "Long dormant claims have often more of cruelty than of justice in them."

In addition to these general policy considerations, statutes of limitation are often used to implement a legislative attitude toward particular types of actions or particular classes of litigants. The short slander period reflects disfavor of this type of action; the two-year and six months medical malpractice period evidences special favorable treatment of a particular class of defendants.

1 J. Weinstein, H. Korn, & A. Miller., N.Y. Civ. Prac. ¶ 201.01, at 2-7 to 2-9 (1995).

State legislatures often provide for different statutes of limitations to be used depending on the claims and the parties at issue. *See, e.g.*, *Pauk v. Bd. of Trs.' of City Univ. of N.Y.*, 654 F.2d 856, 861 (2d Cir. 1981) (reviewing different New York statutes of limitations that could apply to plaintiff's Section 1983 claim). Trying to divine which limitations period to apply to a Section 1983 action was a difficult task because there are no causes of action analogous to a federal suit stating claims under Section 1983. That section is "a uniquely federal remedy" that has "no precise counterpart in state law. Therefore, it is the purest coincidence when state statutes or the common law provide for equivalent remedies; any analogies to those causes of action are bound to be imperfect." *Wilson v. Garcia*, 471 U.S. 261, 271-72 (1985) (internal quotation marks and citations omitted).

Another problem with the borrowing rule is the variety of conduct that can constitute the basis of a valid Section 1983 claim. *See id.* at 274 (cataloguing some of the "numerous and diverse topics and subtopics" that have been alleged as constitutional claims under § 1983). In endeavoring to apply "analogous" state statutes of limitations, courts could apply different limitation periods to different legal claims falling under the umbrella of a Section 1983 claim, which might even happen within the same lawsuit. *Id.*

In the face of these issues, the Supreme Court has explicitly shifted away from the *Johnson* rationale for using state statutes of limitations—that borrowing limitations statutes is a way to borrow the "wisdom" of state legislatures who balanced the interests of repose and substantive justice when considering "closely analogous claims"—and instead has held that "practical considerations . . . explain why a simple, broad characterization of all § 1983 claims best fits the statute's remedial purpose." *Id.* at 272.

The primary practical consideration relied upon by the Court is that a uniform statute of limitations within each state helped further "the [federal] legislative purpose to create an effective remedy for the enforcement of federal civil rights," and the effectiveness of that remedy "is obstructed by uncertainty in the applicable statute of limitations, for scarce resources must be dissipated by useless litigation on collateral matters." *Id.* at 275. Eventually, the Supreme Court decided that the three-year statute of limitations of New York CPLR 214(5), which governs general personal injury actions, should be applicable to any and all Section 1983 actions filed in New York. *Owens v. Okure*, 488 U.S. 235, 251 (1989).

Supreme Court jurisprudence in this area has led to the peculiar result that the time within which a plaintiff must bring a claim under Section 1983 varies widely from state-to-state. *See Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369, 379 (2004) ("[L]imitations borrowing resulted in uncertainty for both plaintiffs and defendants, as a plaintiff alleging a federal claim in State A would find herself barred by the local statute of limitations while a plaintiff raising precisely the same claim in State B would be permitted to proceed."); Katharine F. Nelson, *The 1990 Federal "Fallback" Statute of Limitations: Limitations by Default*, 72 Neb. L. Rev. 454, 483 (1993) ("A person in North Dakota or Maine who has been denied his or her First Amendment rights has six years in which to assert a claim, but a person in Kentucky or Louisiana loses the same First Amendment claim after only one year."); David D. Siegel, *Practice Commentary on Amendment of Federal Rule 4 (Eff. Feb. 26, 1983) with Special Statute of Limitations Precautions*, 96 F.RD. 88, 99 (1983) ("[I]t must strike any observer as incongruous that something as fundamentally 'federal' as a federal civil rights claim should be subject to varying periods from state to state."). Though Congress subsequently passed a law establishing a catch-all federal statute of limitations of four years (*see* 28 U.S.C. § 1658), the law

is not retroactive and "applies only to claims arising under statutes enacted after December 1, 1990." *Jones*, 541 U.S. at 380. For Section 1983 claims, courts are still required to apply the directives of Section 1988 of Title 42 as interpreted by the Supreme Court.

The application of state statutes of limitations to Section 1983 claims comes with a caveat; Section 1988 allows for the application of state law only "'so far as the same is not inconsistent with' federal law." *Wilson*, 471 U.S. at 269 (quoting 42 U.S.C. § 1988). "In order to gauge consistency . . . , the state and federal policies which the respective legislatures sought to foster must be identified and compared." *Tomanio*, 446 U.S. at 487. While "in general, state policies of repose cannot be said to be disfavored in federal law . . . it is appropriate to determine whether" application of a state statute of limitations is appropriate given the federal policies embodied in the creation of a cause of action under Section 1983. *Id.* at 488-89.

The instruction to consider the state's policy in setting the relevant statute of limitations is strange given the Court's acknowledgement that "practical considerations" drove its directive that a single limitations period be used for all Section 1983 claims in any state, and its recognition that "when the federal claim different from the state cause of action in fundamental respects, the State's choice of a specific period of limitation is, at best, only a rough approximation of the point at which the interests in favor of protecting valid claims are outweighed by the interests in prohibiting the prosecution of stale ones." *Wilson*, 471 U.S. at 271-72 (internal quotation marks omitted).

The importance of federal policy in enacting Section 1983 can hardly be overstated. Congress passed Section 1983 as part of the Civil Rights Act of 1871 in response to the terrorist campaigns of the Ku Klux Klan that sought to deny "decent citizens their civil and political rights." *Id.* at 276. "By providing a remedy for the violation of constitutional rights, Congress

hoped to restore peace and justice to the [Southern] region through the subtle power of civil enforcement." *Id.* Section 1983 provides "a uniquely federal remedy against incursions under the claimed authority of state law upon rights secured by the Constitution and laws of the Nation." *Mitchum v. Foster*, 407 U.S. 225, 239 (1972). "The high purposes of this unique remedy make it appropriate to accord the statute a sweep as broad as its language." *Wilson*, 471 U.S. at 272 (internal quotation marks omitted). More specifically, "[t]he policies underlying § 1983 include compensation of persons injured by deprivation of federal rights and prevention of abuses of power by those acting under color of state law." *Robertson v. Wegmann*, 436 U.S. 584, 590-91 (1978).

Congressional policy encourages attorneys to file lawsuits asserting valid Section 1983 claims. Congress passed the Civil Rights Attorney's Fees Act of 1976 (42 U.S.C. § 1988(b))— which allows the court to award a "prevailing party" in "any action or proceeding to enforce a provision of" Section 1983 to recover "a reasonable attorney's fee"—to encourage civil rights lawsuits and deter civil rights violations. *See* David Shub, *Private Attorneys General, Prevailing Parties, and Public Benefit: Attorney's Fees Awards for Civil Rights Plaintiffs*, 42 Duke L.J. 706, 708-712 (1992) (reviewing the legislative history of the Civil Rights Attorney's Fees Act of 1976).

Despite the importance of the policies that undergird Section 1983, "[a] state statute cannot be considered 'inconsistent' with federal law merely because the statute causes the plaintiff to lose the litigation." *Robertson,* 436 U.S. at 593. In *Robertson*, the Supreme Court found that Louisiana's survivorship statute, which did not allow for the executor of the plaintiff's estate to recover pursuant to a decedent-plaintiff's § 1983 action, was not "inconsistent" with

federal law so that it was appropriate to create a federal common law rule that would allow the survival of the action. *Id*. In allowing the action to abate, the Court noted that

> given that most Louisiana actions survive the plaintiff's death, the fact that a particular action might abate surely would not adversely affect § 1983's role in preventing official illegality, at least in situations in which there is no claim that the illegality caused the plaintiff's death. A state official contemplating illegal activity must always be prepared to face the prospect of a § 1983 action being filed against him. In light of this prospect, even an official aware of the intricacies of Louisiana survivorship law would hardly be influenced in his behavior by its provisions.

*Id.* at 592.

> In order to find even a marginal influence on behavior as a result of Louisiana's survivorship provisions, one would have to make the rather farfetched assumptions that a state official had both the desire and the ability deliberately to select as victims only those persons who would die before conclusion of the § 1983 suit (for reasons entirely unconnected with the official illegality) and who would not be survived by any close relatives.

*Id.* at 592 n.10. The Court classified its holding as a "narrow one" in which application of the state law "has no independent adverse effect on the policies underlying § 1983." *Id.* at 594.

In situations where application of a state law could undermine Section 1983's twin goals of compensation and deterrence, courts will not apply that law. *See, e.g.*, *Chaudhury v. City of Los Angeles*, 751 F.3d 1096, 1105 (9th Cir. 2014) ("California's prohibition against pre-death pain and suffering damages limits recovery too severely to be consistent with § 1983's deterrence policy. [The California law] therefore does not apply to § 1983 claims where the decedent's death was caused by the violation of federal law."); *McFadden v. Sanchez*, 710 F.2d 907, 911 (2d Cir. 1983) ("To whatever extent section 1988 makes state law applicable to section 1983 actions, it does not require deference to a survival statute that would bar or limit the remedies available under section 1983 for unconstitutional conduct that causes death. State law that would preclude a claim for punitive damages in a case like the present one is manifestly 'inconsistent' with federal law within the meaning of section 1988.").

### C. Motion for Leave to Amend a Pleading

Prior to trial, "a party may amend its pleading only with the opposing party's written consent or the court's leave. The court should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2). If a scheduling order has been entered setting a deadline for amendments, the schedule "may be modified" to allow the amendment "only for good cause and with the judge's consent." Fed. R. Civ. P. 16(b)(4). While the "primary consideration" for determining whether a party has good cause is if "the moving party can demonstrate diligence," the district court may also consider "other relevant factors including, in particular, whether allowing the amendment of the pleading at this state of the litigation will prejudice defendants." *Kassner v. 2nd Avenue Delicatessen, Inc.*, 496 F.3d 229, 244 (2d Cir. 2007).

It must be kept in mind that all federal civil procedure rules should "be construed, administered, and employed by the court and the parties to secure the *just*, speedy, and inexpensive determination of every action and proceeding." Fed. R. Civ. P. 1 (emphasis added). It is "entirely contrary to the spirit of the Federal Rules of Civil Procedure for decisions on the merits to be avoided on the basis of [] mere technicalities." *Foman v. Davis*, 371 U.S. 178, 181 (1962) (citing Fed. R. Civ. P. 1 and 15 in holding that amendment of a complaint should be freely given so a plaintiff is "afforded an opportunity to test his claim on the merits.").

### D. Relation Back

In some instances, "an amended pleading relates back to the date of a timely filed original pleading and is thus itself timely even though it was filed outside an applicable limitations period." *Krupski v. Costa Crociere S. p. A.*, 560 U.S. 538, 541 (2010). Two forms of "relation back" are relevant. First, an amended pleading relates back when "the law that provides the applicable statute of limitations allows relation back." Fed. R. Civ. P. 15(c)(1)(A). Second, an

amended pleading that adds a new party relates back pursuant to Rule 15(c)(1)(C) if the

following conditions are met:

> (1) the claim must have arisen out of conduct set out in the original pleading; (2) the party to be brought in must have received such notice that it will not be prejudiced in maintaining its defense; (3) that party should have known that, but for a mistake of identity, the original action would have been brought against it; and . . . [4] the second and third criteria are fulfilled within 120 days of the filing of the original complaint, and . . . the original complaint [was] filed within the limitations period.

*Hogan v. Fischer*, 738 F.3d 509, 517 (2d Cir. 2013) (alterations in original) (citing *Barrow v. Wethersfield Police Dept.*, 66 F.3d 466, 468-69 (2d Cir. 1995)).

### 1) Federal Rule 15(c)(1)(A)

For a claim brought pursuant to 42 U.S.C. § 1983, "the law that provides the applicable statute of limitations" is the law of the state in the jurisdiction in which the federal district court sits because there is no federal statute of limitations. *See Wilson*, 471 U.S. at 275; *Hogan*, 738 F.3d at 518. Courts must "look to the entire *body* of limitations law that provides the applicable statute of limitations." *Hogan*, 738 F.3d at 518 (emphasis in original). If the claim would be saved under an applicable state law, that law must be applied. *Id.*

### a) New York CPLR 1024

New York has a rule that specifically pertains to claims against John Doe defendants.

CPLR 1024 reads:

> A party who is ignorant, in whole or in part, of the name or identity of a person who may properly be made a party, may proceed against such person as an unknown party by designating so much of his name and identity as is known. If the name or remainder of the name becomes known all subsequent proceedings shall be taken under the true name and all prior proceedings shall be deemed amended accordingly.

New York courts have read two additional requirements into the application of CPLR 1024: (1) there must not be prejudice to the newly-substituted defendant, and (2) the plaintiff must have

been reasonably diligent in attempting to ascertain the identity of the unknown defendant prior to the expiration of the statute of limitations. *Hogan*, 738 F.3d at 518-19.

There is also a third requirement, which arises from the interaction of CPLR 1024 and CPLR 306-b—the newly-named defendant must be served within 120 days of the filing of the complaint. *Bumpus v. New York City Tr. Auth.*, 66 A.D.3d 26, 31-32 (N.Y. App. Div. 2009). This 120-day service requirement may be extended "upon good cause shown or in the interest of justice." *Id.* at 31 (quoting CPLR § 306-b). "To establish good cause, a plaintiff must demonstrate reasonable diligence in attempting service." *Id.* Whether an extension is in "the interests of justice" is a broader inquiry that takes into consideration the merits of the underlying action, diligence, and prejudice to the defendant, among other factors. *Id.* at 32.

### b) New York CPLR 203

Within the body of New York limitations law is also a more general relation-back statute, CPLR 203. A plaintiff's claims against one defendant may relate back to claims asserted against another if:

> (1) both claims arose out of the same conduct, transaction, or occurrence, (2) the new party is 'united in interest' with the original defendant, and by reason of that relationship can be charged with such notice of the institution of the action that he will not be prejudiced in maintaining his defense on the merits, and (3) the new party knew or should have known that, but for a[] . . . mistake by plaintiff as to the identity of the proper parties, the action would have been brought against him as well.

*Buran v. Coupal*, 661 N.E.2d 978, 981 (N.Y. 1995). "[T]he doctrine enables a plaintiff to correct a pleading error . . . after the statutory limitations period has expired [and] . . . thus gives courts the sound judicial discretion to identify cases that justify relaxation of limitations strictures to facilitate decisions on the merits if the correction will not cause undue prejudice to the plaintiff's adversary." *Id.* (internal citations, quotation marks, and alteration omitted).

*Buran* is a leading policy determining case for New York decided by its highest court. It greatly expanded opportunities to relate back for amendments based on new defendants. Prior to the decision of the New York Court of Appeals in *Buran*, many lower courts only allowed relation back if the mistake by the plaintiff as to identity of the proper parties was "excusable." In *Buran*, the Court of Appeals held that the mistake need not be "excusable," and that requiring courts to evaluate the excusability of the mistake "unwisely focuses attention away from . . . the primary consideration in such cases—whether the *defendant* could have reasonably concluded that the failure to sue within the limitations period meant that there was no intent to sue that person at all and that the matter had been laid to rest as far as he is concerned." *Id.* at 983 (emphasis in original) (internal quotation marks omitted).

Notice to the defendant, rather than the diligence of the plaintiff, is the "'linchpin' of the relation back doctrine." *Id.* (quoting *Schiavone v. Fortune*, 477 U.S. 21, 31 (1986)). The "practical effect" of requiring excusability "ha[d] been to render the relation back doctrine meaningless in all but rare circumstances. . . . Surely, such a result is not in keeping with modern theories of notice pleading and the admonition that the Civil Practice Law and Rules 'be liberally construe to secure the just, speedy and inexpensive determination of every civil judicial proceeding.'" *Id.* (quoting CPLR 104).

The New York Court of Appeals clarified that tactical jockeying is not encouraged.

This is not to say, however, that removing the excusability requirement from the third prong would prevent a court from refusing to apply the doctrine in cases where the plaintiff omitted a defendant in order to obtain a tactical advantage in the litigation. When a plaintiff intentionally decides not to assert a claim against a party known to be potentially liable, there has been no mistake and the plaintiff should not be given a second opportunity to assert that claim after the limitations period has expired.

*Id.*  Courts may also be "justified in denying a plaintiff the benefit of the doctrine in order to prevent delay or disruption in the normal course of the lawsuit.  Application of the doctrine in such circumstances would likely result in prejudice to the adversary and, as noted above, bar application of the doctrine under the second prong."  *Id.*

The first prong of the *Buran* test—same occurrence—is easily applied and rarely litigated.  The second prong, whether the new defendant is "united in interest" with the timely named defendant so that the new defendant can be charged with notice and will not be prejudiced, requires further exploration.  "[T]he question of unity of interest is to be determined from an examination of (1) the jural relationship of the parties whose interests are said to be united and (2) the nature of the claim asserted against them by the plaintiff."  *Amaya v. Garden City Irrigation, Inc.*, 645 F. Supp. 2d 116, 122 (E.D.N.Y. 2009) (citing *Connell v. Hayden*, 83 A.D.2d 30, 42-43 (N.Y. App. Div. 1981)).  A "jural relationship" is simply a "legal relationship giving rise to potential liability."  *Id.*

 "The most frequently cited relationship creating a unity of interest is vicarious liability, such as between an employer and employee or a corporation and its agents."  *Id*.  This relationship it has been held does not lead to a unity of interest in the context of a Section 1983 lawsuit because "a municipality cannot be held liable *solely* because it employs a tortfeasor, or, in other words, a municipality cannot be held liable under section 1983 on a *respondeat superior* theory."  *Monell v. Department of Social Services*, 436 U.S. 658, 691 (1978) (italics in original); *Higgins v. City of New York*, 144 A.D.3d 511, 513-16 (N.Y. App. Div. 2016) (holding that there is no unity of interest between a city and its police officers because the city can only be held liable under *Monell* and is not vicariously liable for the actions of its officers); *cf. Llerando-Phipps v. City of New York*, 390 F. Supp. 2d 372, 385 (S.D.N.Y. 2005) (allowing claims

substituting individual officer names to relate back under CPLR 203 "because the individual officers are 'united parties in interest' with their employer, Defendant City of New York.").

The reality as observed in practice, however, is that the City and police officers have a practical unity of interest. The practice is for the City to pay any officers damages in almost all Section 1983 cases. New York City has a statutory obligation to indemnify individual policer officers for their tortious conduct so long as the tortious conduct "occurred while the employee was acting within the scope of his employment and in the discharge of his duties and was not in violation of any rule or regulation of his agency at the time the alleged act or omission occurred." N.Y. Gen. Mun. Law § 50-k(2) (McKinney 2017). "New York courts have . . . found that the duty to indemnify creates a unity of interest between parties." *Strada v. City of New York*, No. 11–CV–5735, 2014 WL 3490306, at *7 (E.D.N.Y. July 11, 2014) (citing New York cases). In circumstances where the City is bound by this duty, or uniform practice, the indemnification obligation is sufficient to constitute a "unity of interest" that passes the muster of the second prong of CPLR 203. *See Strada*, 2014 WL 3490306 at *8 n.6 ("[H]ere, the City—the originally named party—has the duty to represent and indemnify the untimely-added officers. . . . [T]he statutory duty of the City to indemnify its officers, even absent vicarious liability, is sufficient to create a unity of interest between the parties.").

The third prong of the relation back test asks whether the new party knew or should have known that, but for a mistake by plaintiff as to the identity of the proper parties, the action would have been brought against him as well. Whether this prong is met often turns on interpretation of the word "mistake." Most federal district courts have held that the term "mistake" in CPLR 203 should be given the same meaning as the term is given in Rule 15(c)(1)(C) of the Federal Rules of Civil Procedure. *See, e.g.*, *Briggs v. County of Monroe*, 09–CV–6147W, 2016 WL 1296060,

at *10 (W.D.N.Y. Mar. 29, 2016) (citing cases). Nevertheless, as narrowly interpreted by the Court of Appeals for the Second Circuit, there is no "mistake in identity" that allows for relation back under Rule 15(c)(1)(C) if the "added defendants were not named originally because the plaintiff did not know their identities. . . . [T]he failure to identify individual defendants when the plaintiff knows that such defendants must be named cannot be characterized as a mistake." *Barrow v. Wethersfield Police Dept.*, 66 F.3d 466, 469-70 (2d Cir. 1995); *see Hogan*, 738 F.3d at 517-18 (same); *see also infra* Part IV(D)(2).

Other federal district courts have inquired whether the plaintiff intentionally did not initially name the newly added defendants. *Amaya*, 645 F. Supp. 2d at 124; *Ingenito v. Riri USA, Inc.* 89 F. Supp. 3d 462, 483 (E.D.N.Y. 2015). Under this inquiry, relation back is available if a plaintiff lacked knowledge of the true identity of the defendant, but the plaintiff evinces a lack of mistake if he fails to amend his complaint in a timely manner upon learning the defendant's proper identity. *See, e.g.*, *Amaya*, 645 F. Supp. 2d at 124 ("Plaintiffs were aware of Tedesco's role at least as of May 12, 2005, when he was added as a third-party defendant, yet they did not seek to add him as a direct defendant for almost three years."); *Strada*, 2014 WL 3490306, at *9 ("Plaintiff offers no explanation for his failure to timely amend the Complaint to add the proposed defendants despite having knowledge of the individual defendants' potential liability by, at least, October 3, 2012 . . . Here, by Plaintiff's own representation, he knew of all of the proposed defendants over a month before the statute of limitations expired on November 7, 2012.").

The role of the federal district court judge, when confronted with an issue of state law, is not to graft on to state law the precedent of a similar federal law, but to "ascertain from all the available data what the state law is and apply it [as a state court would] rather than to prescribe a

different rule, however superior it may appear from the viewpoint of 'general law' and however much the state rule may have departed from prior decisions of the federal courts." *West v. American Tel. & Tel. Co.*, 311 U.S. 223, 237 (1940). "A federal court faced with a question of unsettled state law must do its best to guess how the state court of last resort would decide the issue. Where the high court has not spoken, the best indicators of how it would decide are often the decisions of lower state courts." *In re Brooklyn Navy Yard Asbestos Litig.*, 971 F.2d 831, 850 (2d Cir. 1992) (internal citations omitted).

Not every New York state court interprets the term "mistake" in the state relation-back test in the same way the New York federal courts do when applying the federal relation-back test. The different appellate departments evaluate the third prong in different ways.

The Fourth Department is the most permissive in allowing relation back. In that Department, filing a complaint against a "John Doe" defendant because of ignorance of the proper party's identity *is* a "mistake in identity" that allows for claims against newly-named parties to relate back to the original filing against "John Doe." In *Kirk v. University Ob-gyn Assoc., Inc.*, plaintiffs sued a hospital, individual doctors, and "John Doe, M.D." and "Jane Roe, M.D." for medical malpractice related to injuries sustained by an infant during the infant's delivery. 104 A.D.3d 1192, 1193-94 (N.Y. App. Div. 2013). One year after the statute of limitations became a bar, the plaintiffs moved for leave to amend their complaint by substituting the name of the physician who performed the delivery in place of "John Doe, M.D." The lower court granted the plaintiffs leave to amend their complaint. On appeal, the newly named physician argued that "there was no mistake and only neglect on the part of plaintiffs[;] [the appellate division agreed] with plaintiffs, however, [noting] that even if they were negligent,

there was still a mistake by plaintiffs in failing to identify [the newly named physician] as a defendant." *Id.* at 1194.

Following *Kirk*, the Fourth Department affirmed this interpretation of mistake in *Johanson v. County of Erie*. It held that "the third prong [of the relation back test] [was] satisfied" where a plaintiff moved to add a sheriff to a wrongful death complaint after the statute of limitations expired. *Johanson v. County of Erie,* 134 A.D.3d 1530, 1531 (N.Y. App Div. 2015) (citing *Kirk* and *Buran*). In *Nasca v. DelMonte* it held "that plaintiffs also satisfied the third prong of [the relation back] test inasmuch as they established that their failure to include DelMonte P.C. as a defendant in the original or first amended complaint was a mistake and not the result of a strategy to obtain a tactical advantage." 111 A.D.3d 1427, 1429 (N.Y. App. Div. 2013) (citing *Kirk* and *Buran*) (internal quotation marks and alteration omitted).

The Third and First Departments hew closer to the narrower federal *Barrow* rule (*see infra* Part IV(D)(2), discussing the Barrow under Rule 15(c)(1)(A)) that "plaintiffs' failure to identify [a newly-named defendant] prior to commencing this action was not the result of any mistake but, rather, was the product of their failure to make a timely and genuine attempt to ascertain [the defendant's] identity. [And] therefore reject plaintiffs' assertion that they should be permitted . . . to utilize th[e] [relation back] doctrine." *Hall v. Rao*, 26 A.D.3d 694, 696 (N.Y. App. Div. 2006); *see also Tucker v. Lorieo*, 291 A.D.2d 261, 262 (N.Y. App. Div. 2002) ("In this case, however, the failure to identify Lorieo in the original summons and complaint and make timely service on him was not due to a mistake on the part of plaintiff in identifying the proper parties. Rather, it was due to plaintiff's failure to timely request the hospital record and ascertain Lorieo's identity.").

The Second Department also requires that plaintiffs demonstrate "that diligent efforts were made to ascertain the unknown party's identity prior to the expiration of the statute of limitations," but this is an "added burden" to fulfilling the other three prongs of Section 203 and not an outgrowth of the third prong. *Bumpus v. N.Y.C. Tr. Auth.*, 66 A.D.3d 26, 35 (N.Y. App. Div. 2009).

Though the *Hall*, *Tucker*, and *Bumpus* decisions fault plaintiffs for their ignorance of the proper party's identity, other decisions from the same courts have ruled that ignorance of the proper party's identity is a prerequisite to invoking the relation-back doctrine. In *Somer & Wand, P.C. v. Rotondi*, the Appellate Division Second Department did not allow an amended complaint adding the individual shareholders of a professional corporation to relate back to the original filing because the counterclaimants "concede that they were aware of the identities of the individual shareholders . . . when they commenced the action . . . [and] contend that they intentionally did not name and serve the individual shareholders because they believed that the shareholders would be personally liable under Business Corporation Law § 1505(a)." 251 A.D.2d 567, 568-69 (N.Y. App. Div. 1998). The court held that "[t]he mistake here was not a mistake as to the identity of the shareholders, but a mistake of law, which is not the type of mistake contemplated by the relation-back doctrine." *Id.* at 569. The Third Department came to the same conclusion that a "mistake resulting from a misapprehension" about the law is "not a mistake as to . . . identity." 239 A.D.2d 735, 736 (N.Y. App. Div. 1997).

These decisions produce a patchwork of conflicting rules about when relation back should be permitted, complicating the task of federal districts courts in discerning how the New York Court of Appeals or the Court of Appeals for the Second Circuit would rule on this issue. The Fourth Department allows relation back when there has been a John Doe pleading without

regard to a plaintiff's diligence in identifying the unknown defendant. *See, e.g.*, *Kirk v. University Ob-gyn Assoc., Inc.*, 104 A.D.3d 1192, 1193-94 (N.Y. App. Div. 2013). The First and Third Departments classify naming John Doe as a defendant as a failure to ascertain a defendant's identity, rather than a "mistake" in identity. *See, e.g.*, *Hall v. Rao*, 26 A.D.3d 694, 696 (N.Y. App. Div. 2006); *Tucker v. Lorieo*, 291 A.D.2d 261, 262 (N.Y. App. Div. 2002). The Second Department recognizes that suing John Doe could be a mistake, but plaintiffs may only avail themselves of the relation back doctrine if they attempted to avoid this mistake by making a sufficient effort to identify the defendant prior to filing suit. *See, e.g.*, *Bumpus v. New York City Tr. Auth.*, 66 A.D.3d 26, 35 (N.Y. App. Div. 2009).

The *Buran* decision by the New York Court of Appeals is the best guidance on which of these approaches the New York Court of Appeals would likely adopt as the New York rule. Based on *Buran*, it appears that the permissive approach of the Fourth Department is most aligned with New York Court of Appeals precedent. In *Buran*, the Court explicitly eschewed a prior iteration of the doctrine that required a plaintiff's mistake to be "excusable." *Buran*, 661 N.E.2d at 981-83. Focusing on the diligence of the plaintiff, as the First, Second, and Third Appellate Division Departments do, is a reintroduction of the excusability gloss that the Court of Appeals abandoned. While noting, with disdain, that "the practical effect [of the excusability requirement] for New York litigants has been to render the relation back doctrine meaningless in all but rare circumstances," the New York Court of Appeals cited the Second Department's decision in *Sandor v. Somerstown Plaza Assocs.* as emblematic of this trend. *Id.* at 983. In *Sandor*, the appellate court did not allow relation back because the "plaintiff did not diligently attempt to ascertain the true identity of the defendant before the running of the statute of limitations," meaning the plaintiff's failure to timely identify the proper defendant "was not

attributable to any reasonable mistake, but to her own inexcusable neglect." 210 A.D.2d 212, 213-14 (N.Y. App. Div. 1994) (internal quotation marks omitted). The *Buran* Court held that the result in *Sandor* was "not in keeping with modern theories of notice pleading and the admonition that the Civil Practice Law and Rule be liberally construed to secure the just, speedy and inexpensive determination of every civil judicial proceeding." *Buran*, 661 N.E.2d at 983 (internal quotation marks omitted).

The *Buran* decision traced the "excusable mistake" requirement back to "a judicial gloss imposed on rule 15(c) [of the Federal Rules of Civil Procedure]" by courts which denied plaintiffs the benefit of relation back

> on grounds that they deliberately failed to identify the proper party who was known to them at the time . . . or where the proposed new defendant had no notice of the pendency of the action such that the defendant could not reasonably have expected to have been sued. . . . Despite the existence of this judicially created exception to the doctrine for reasons of lack of notice or bad faith, it is apparent that apart from excusability of the mistake, the *Brock* test already provides an independent ground for denying application of the doctrine in these cases—absence of mistake under the first prong or operative prejudice to the defendant under the second. Adding the word 'excusable' to the third prong effectively converts what are already valid considerations under the first and second prongs into an independent factor under the third.

*Id.* at 982-83 (internal citation omitted). If a plaintiff is not diligent in ascertaining the defendant's identity and amending his claim, a court has the discretion to deny "a plaintiff the benefit of the doctrine in order to prevent delay or disruption in the normal course of the lawsuit." *Id.* at 983. Denial under these circumstances, though, would be under the "second prong" since plaintiff's nondiligence "would likely result in prejudice to the adversary." *Id.*

In the present case, this court concludes that the New York Court of Appeals, if deciding this issue, would hold that the diligence of the plaintiff is not an aspect of the "mistake" prong,

and suing "John Doe" when a defendant's identity is unknown is a mistake for purposes of the relation-back doctrine of CPLR 203.

To the extent that the state law on relation back is relevant and ambiguous, the Court of Appeals for the Second Circuit may certify the question to the New York Court of Appeals. *See* Second Circuit Local Rule 27.2; N.Y. Comp. Codes R. & Regs. tit. 22, § 500.27(a) (2017). A federal district court does not have this procedure available to it and must decide considering the state and federal relations at play. Under the circumstances of the present case relation back should be permitted. *See supra* Parts V(C)-(D).

### 2) Federal Rule 15(c)(1)(C)

"Rule 15(c)(1)(C) provides the federal standard for relation back." *Hogan,* 738 F.3d at 517. "For an amended complaint adding a new party to relate back under Rule 15(c)(1)(C), the following conditions must be met:

> (1) the claim must have arisen out of conduct set out in the original pleading; (2) the party to be brought in must have received such notice that it will not be prejudiced in maintaining its defense; (3) that party should have known that, but for a mistake of identity, the original action would have been brought against it; and . . . [4] the second and third criteria are fulfilled within 120 days of the filing of the original complaint, and . . . the original complaint [was] filed within the limitations period."

*Id.* (citing *Barrow*, 66 F.3d at 468-69). Substitution of a real name for a "John Doe" defendant "adds a new party" to a complaint so that claims against that new party only relate back if the strictures of Rule 15 are met. *Aslanidis v. U.S. Lines, Inc.*, 7 F.3d 1067, 1075 (2d Cir. 1993).

The leading federal case on relation-back in the context of a John Doe pleading is *Barrow v. Wethersfield Police Dept.*, 66 F.3d 466 (2d Cir. 1995). In *Barrow*, a plaintiff brought suit against a police department under Section 1983. The complaint originally only named the police department as a defendant. The complaint was later amended to include John Does, and then to

include the names of six police officers.  The only pleading that was filed within the statute of limitations was the original complaint naming only the police department.  The six officers moved to dismiss the complaint under Rule 12(b)(1) on the theory that the claims were barred by the statute of limitations.  The district court granted the motion, finding that the "defendants' attorneys were not served with a complaint until . . . considerably after the limitations period had expired," and the plaintiff made no showing "that the six individual defendants had even constructive knowledge of the claims against them within 120 days of the court's receipt of the initial complaint."  *Id.* at 467.

The Court of Appeals for the Second Circuit framed the issue before it in *Barrow* as "whether defendants who are not named originally because the plaintiff lacks knowledge of their identity are, within the meaning of [Rule 15(c)(1)(C)], not named because of a 'mistake' concerning their identity."  *Id.* at 469.  The court held restrictively that

> the rule is meant to allow an amendment changing the name of a party to relate back to the original complaint only if the change is the result of an error, such as a misnomer or misidentification . . . [w]e are compelled to agree with our sister circuits that Rule 15(c) does not allow an amended complaint adding new defendants to relate back if the newly-added defendants were not named originally because the plaintiff did not know their identities.  Rule 15(c) explicitly allows the relation back of an amendment due to a 'mistake' concerning the identity of the parties (under certain circumstances), but the failure to identify individual defendants when the plaintiff knows that such defendants must be named cannot be characterized as a mistake . . . .  His amended complaint identifying six police officers by name—filed, by any calculation, after the statute of limitations had run—did not correct a mistake in the original complaint, but instead supplied information Barrow lacked at the outset. Since the new names were added not to correct a mistake but to correct a lack of knowledge, the requirements of Rule 15(c) for relation back are not met."

*Id.* at 469-70.

Relying on *Barrow*, most federal district courts within the Second Circuit have not allowed the amendment of a complaint to add an individual officer's name after the statute of

limitations has run to relate back to the filing of the original complaint naming "John Doe" as a defendant; instead they rule that Section 1983 claims are time-barred against the newly named defendants. *See, e.g.*, *Feliciano v. County of Suffolk*, No. CV 04–5321, 2013 WL 1310399 (E.D.N.Y. Mar. 28, 2013); *Felmine v. City of New York*, No. 09–CV–3768, 2012 WL 1999863 (E.D.N.Y. June 4, 2012); *Sherrard v. City of New York*, No. 15-CV-7318, 2016 WL 1574129 (S.D.N.Y. Apr. 15, 2016) (dismissing as time-barred claims brought against defendants originally named as John Does when complaint was filed one day before statute of limitations).

 *Barrow* is readily distinguished from the instant case. In *Barrow* no police officer was named, unlike here where the wrong police officer was named and the City should have known this and promptly informed Plaintiff's counsel of the correct defendant. *See infra* Part V.

 In 2010, in *Krupski v. Costa Crociere S.p.A.*, the Supreme Court of the United States, like the New York Court of Appeals in *Buran*, took a liberal position. 560 U.S. 538 (2010). It held that "relation back under Rule 15(c)(1)(C) depends on what the party to be added knew or should have known, not on the amending party's knowledge or its timeliness in seeking to amend the pleading." *Id.* at 541. In *Krupski*, a woman who was injured on a cruise sued "Costa Cruise Lines," the sales and marketing agent of "Costa Crociere S. p. A.," the operator of the cruise. The plaintiff, after the statute of limitations expired, amended the complaint to sue the proper party (the operator), but the district and circuit court held that the claim was time-barred since the amendment did not relate back. They held that the amendment did not relate back because Krupski knew or should have known about Costa Crociere's identity as a potential party, and Krupski therefore chose to sue the sales agent and did not make a "mistake" as to the identity of the party.

The Supreme Court, unanimously, disagreed with this restrictive position on relating back.

> The Court of Appeals first decided that Krupski either knew or should have known of the proper party's identity and thus determined that she had made a deliberate choice instead of a mistake in not naming Costa Crociere as a party in her original pleading. By focusing on Krupski's knowledge, the Court of Appeals chose the wrong starting point. <u>The question under Rule 15(c)(1)(C)(ii) is</u> not whether Krupski knew or should have known the identity of Costa Crociere as the proper defendant, but <u>whether Costa Crociere knew or should have known that it would have been named as a defendant but for an error.</u> Rule 15(c)(1)(C)(ii) asks what the prospective *defendant* knew or should have known during the Rule 4(m) period, not what the *plaintiff* knew or should have known at the time of filing her original complaint.

*Id.* at 548 (italicized sentences in original) (underlined sentences for emphasis added).

> We agree that making a deliberate choice to sue one party instead of another while fully understanding the factual and legal differences between the two parties is the antithesis of making a mistake concerning the proper party's identity. We disagree, however, with respondent's position that any time a plaintiff is aware of the existence of two parties and chooses to sue the wrong one, the proper defendant could reasonably believe that the plaintiff made no mistake. The reasonableness of the mistake is not itself at issue. As noted, a plaintiff might know that the prospective defendant exists but nonetheless harbor a misunderstanding about his status or role in the events giving rise to the claim at issue, *and she may mistakenly choose to sue a different defendant based on that misimpression. That kind of deliberate but mistaken choice does not foreclose a finding that Rule 15(c)(1)(C)(ii) has been satisfied.*

*Id.* at 549 (emphasis added).

Despite *Krupski*'s admonition that courts focus on the knowledge of the defendant, rather than that of the plaintiff, the Court of Appeals for the Second Circuit has not yet abandoned the *Barrow* rule. In *Hogan v. Fischer*, 738 F.3d 509 (2d Cir. 2013), citing *Barrow*, it noted that "[t]his Circuit has interpreted the rule to preclude relation back for amended complaints that add new defendants, where the newly added defendants were not named originally because the plaintiff did not know their identities . . . [T]he failure to identify individual defendants when the plaintiff knows that such defendants must be named cannot be characterized as a mistake." *Id.* at

517-18.  Ruling that the plaintiff was "time-barred from amending his complaint," the court held that "[t]his Court's interpretation of Rule 15(c)(1)(C) makes clear that the lack of knowledge of a John Doe defendant's name does not constitute a 'mistake of identity.'"  *Id.* at 518.

A year later the Court of Appeals for the Second Circuit again relied upon *Barrow*, distinguishing the Supreme Court's *Krupski* on the grounds that a plaintiff's substitution of an officer's name for John Doe is not "correct[ing] a mistake of fact," but rather "seek[ing] to add information—the names of the officers involved—that he lacked when he filed the complaint." *Scott v. Vill. Of Spring Valley*, 577 F. App'x 81, 83 (2d Cir. 2014).  Following these decisions, district courts have almost uniformly held that *Barrow* is still good law despite *Krupski*.  *See, e.g.*, *Morales v. County of Suffolk*, 952 F. Supp. 2d 433, 437-38 (E.D.N.Y. 2013) (citing cases).

The guidance of the Second Circuit Court of Appeals after *Krupski*—and the district courts following that court's reasoning—seems too narrow in view of the importance of Section 1983 actions.  It can be revisited by the Court of Appeals for the Second Circuit.  *Cf. Singletary v. Pa. Dep't of Corr.*, 266 F.3d 186, 201 n.4 (3d Cir. 2001) ("[S]ome Courts of Appeals have held that proposed amended complaints that seek to replace a 'John Doe' or other placeholder name in an original complaint with a defendant's real name do not meet Rule 15(c)(3)(B)'s 'but for a mistake' requirement. We find this conclusion to be highly problematic. It is certainly not uncommon for victims of civil rights violations . . . to be unaware of the identity of the person or persons who violated those rights.  *This information is in the possession of the defendants*, and many plaintiffs cannot obtain this information until they have had a chance to undergo extensive discovery following institution of a civil action.") (emphasis added).

Despite the rule of the Court of Appeals for the Second Circuit, some district courts have sought to follow the spirit of *Krupski* and have carved out an exception to *Barrow* "*in situations*

*where the defendants withheld identifying information or unreasonably delayed in producing such information.*" *Feliciano v. Cty. Of Suffolk*, No. CV 04–5321, 2013 WL 1310399, at *9 (E.D.N.Y. Mar. 28, 2013) (emphasis added). These cases have held that relation back may be allowed when the "plaintiff attempted to discover the identity of an unknown defendant but was prevented from doing so by defense counsel's conduct." *Wallace v. Warden of M.D.C.*, 14 Civ. 6522, 2016 WL 6901315, at *8 (S.D.N.Y. Nov. 23, 2016) (citing *Byrd v. Abate*, 964 F. Supp. 140, 147 (S.D.N.Y. 1997), *Archibald v. City of Hartford*, 274 F.R.D. 371, 378-79 (D. Conn. 2011), and *Morales v. County of Suffolk*, 952 F. Supp. 2d 433, 438 (E.D.N.Y. 2013)).

In *Byrd*, the plaintiff attempted to learn the name of the John Doe defendant by serving discovery requests before the statute of limitations expired, but was stymied by the Corporation Counsel of the City. On that basis, the district court distinguished the case from *Barrow*, holding that

> it was the defense, rather than the plaintiff, who failed to identify the individual defendant despite Byrd's requests for that information. The identity of Hults [the John Doe defendant] was information uniquely within the knowledge of Corporation Counsel . . . . Byrd's counsel could obtain Hults' identity only from Corporation Counsel. Byrd's counsel requested that information prior to the end of the limitations period, but Corporation Counsel did not comply until after the limitations period had run. To hold that Rule 15(c) does not permit relation back in such circumstances would permit defense counsel to eliminate claims against any John Doe defendant merely by resisting discovery requests until the statute of limitations has ended.

*Byrd*, 964 F. Supp. at 146.

Hults received sufficient notice of the complaint within 120 days of its filing because he was being represented by the same attorney that was representing the other defendants in the case, and "[n]otice of a lawsuit can be imputed to a new defendant state official through his attorney, when the attorney also represents the officials originally sued." *Id.* Imputation of notice to the defendant through his attorney was proper because "the attorney knew or should

have known that the additional defendant would be added to the existing suit" because of the specificity of the original complaint in describing John Doe as the officer on duty during the incident that caused the plaintiff's injury. *Id.*

In *Archibald*, the court followed *Byrd*. It looked specifically at four criteria while holding that relation back was permitted. First, it permitted relation back because the defendants substituted for John Doe had sufficient notice of the suit due to the specificity of the original complaint and their representation by the same attorneys representing the defendants identified in the original complaint. *Archibald*, 274 F.R.D. at 379-81. The defendants seeking to use the statute of limitations defense did not argue that they "lacked constructive notice of the action or that they would be prejudiced in defending the case on the merits." *Id.* at 381. Second, it noted that the Supreme Court held that the Rule 15 analysis focuses on what the "*defendant* knew or should have known . . . not what the *plaintiff* knew or should have known at the time of filing" of the original complaint. *Id.* (quoting K*rupski*, 560 U.S. at 548 (emphasis in *Krupski*)). The rule

> essentially requires that a newly added defendant must not have had reason to believe that the failure to add his name during the limitations period resulted from an intentional decision not to sue him. In this case, Officers Labbe and Spearman knew or should have known through their counsel that they would have been named as Defendants before the limitations period ended, but for Mr. Archibald's inability to obtain that information from defense counsel itself.

*Id.* Third, the plaintiff tried to timely identify the officers through discovery "[w]ell before the end of the three-year limitations period," and followed up on his demands when the responses were "unsatisfactory," but his efforts to identify the officers were "either completely rebuffed or substantially delayed by defense counsel." *Id.* Finally, the court relied on the obligation of defense counsel to correct a misapprehension of plaintiff's counsel. It stated that it seems

> indisputable that when a plaintiff asks repeatedly during discovery for the names of the officers who engaged him, *the City's police department has an obligation to conduct research and to disclose the identities of those officers*. As Rule 26(g)(1)

of the Federal Rules of Civil Procedure states: Counsel's signature on a discovery request discloses that the information is "complete and correct as of the time it is made," "consistent with the rules," and "not interposed for any improper purpose, such as . . . caus[ing] unnecessary delay." Fed. R. Civ. Proc. 26(g)(1). "Discovery is not supposed to be a shell game, where the hidden ball is moved round and round and only revealed after so many false guesses are made and so much money is squandered." *Lee v. Max International, LLC*, 638 F.3d 1318 (10th Cir.2011). Defense counsel is not entitled to transform discovery of the names of police officers who engaged the Plaintiff into a game of hide-and-seek. Regrettably, that is what it became in this case—and needlessly so . . . . [T]he Court believes that *it would be inequitable and inconsistent with the purposes of Rule 15 and Rule 26 to punish Mr. Archibald for the Defendants' obstruction of his counsel's diligent efforts to determine the identities of the "Doe" officers . . . .*

*Id.* at 382 (emphasis added).

How much weight should be given to the diligence of plaintiff's counsel is not clear. It does not appear sound policy in 1983 civil rights cases for the allegedly abused client to be punished for the failure of his attorney to move past "enough" on the "diligence scale"

### E. Disclosure Obligations

Rule 26 of the Federal Rules of Civil Procedure requires a party—without court order—to disclose

> the name and, if known, the address and telephone number of each individual likely to have discoverable information—along with the subjects of that information—that the disclosing party may use to support its claims or defenses, unless the use would be solely for impeachment.

Fed. R. Civ. P. 26(a)(1)(A)(i).

> A party must make its initial disclosures based on the information then reasonably available to it. A party is not excused from making its disclosures because it has not fully investigated the case or because it challenges the sufficiency of another party's disclosures or because another party has not made its disclosures.

Fed. R. Civ. P. 26(a)(1)(E). These initial disclosures must occur "within 14 days after the parties' Rule 26(f) conference unless a different time is set by stipulation or court order" (Fed. R. Civ. P. 26(a)(1)(C)), and the 26(f) conference must take place "as soon as practicable—and in

any event at least 21 days before a scheduling conference is to be held or a scheduling order is due under Rule 16(b)."  Fed. R. Civ. P. 26(f)(1).

The 16(b) scheduling order must be issued "as soon as practicable, but unless the judge finds good cause for delay, the judge must issue it within the earlier of 90 days after any defendant has been served with the complaint or 60 days after any defendant has appeared." Fed. R. Civ. P. 16(b)(2).  In sum, parties generally must make their initial disclosures—at the latest—either 83 days after any defendant has been served with the complaint or 53 days after any defendant has appeared.

Beyond the initial disclosures, parties have an obligation to promptly and efficaciously respond to discovery requests.  *See Rodriguez v. Pie of Port Jefferson Corp.*, No. CV 14-0519, 2015 WL 1513979, at *2 (E.D.N.Y. Mar. 13, 2015) (noting that in discovery counsel must still adhere to the goals of Federal Rule of Civil Procedure 1 to work towards a "just, speedy and inexpensive determination" of every matter).  The purpose of discovery is to allow the parties to litigate based on complete information—"[m]utual knowledge of all the relevant facts gathered by both parties is essential to proper litigation."  *Hickman v. Taylor*, 329 U.S. 495, 507 (1947). In order to facilitate this sharing of information, "[c]ounsel are expected to cooperate with each other, consistent with the interests of their clients, in all phases of the discovery process and to be courteous in their dealings with each other, including in matters relating to scheduling and timing of various discovery procedures."  S.D.N.Y. & E.D.N.Y Local R. Civ. P. 26.4(a) (formerly S.D.N.Y. & E.D.N.Y Local R. Civ. P. 26.5).  "Discovery requests shall be read reasonably in the recognition that the attorney serving them generally does not have the information being sought and the attorney receiving them generally does have such information or can obtain it from the client."  S.D.N.Y. & E.D.N.Y Local R. Civ. P. 26.4(b) (formerly S.D.N.Y. & E.D.N.Y Local R.

Civ. P. 26.7). This local rule requires cooperation from the opposing counsel in discovering

critical facts, not an avoidance by the monkey's: don't see, don't hear, don't say.

### F.  Particular Need for Discovery in Police Civil Rights Cases

Decisions of the Court of Appeals for the Second Circuit reflect the broad principle that

courts should not be quick to dismiss plaintiffs for lack of information that is in the possession of

the defendants.  Elimination of the information asymmetry that exists at the outset of every case

is a bedrock principle of our legal system; after all, "[m]utual knowledge of all the relevant facts

gathered by both parties is essential to proper litigation."  *Hickman v. Taylor*, 329 U.S. 495, 507

(1947).  The Court of Appeals for the Second Circuit has consistently emphasized that courts

should be more lenient with civil rights pleadings and permit discovery when plaintiffs would

otherwise not be able to state a claim for relief due to a lack of information about defendants and

their practices.  Though the court has been particularly solicitous of allowing discovery under

these circumstances when the plaintiff appears *pro se*, the rationale of these decisions is not so

limited.

For example, in *Davis v. Kelly*, a prisoner brought a *pro se* action under Section 1983

alleging he was transferred in retaliation for his bringing a lawsuit.  160 F.3d 917 (2d Cir. 1998).

The only defendant was Warden Kelly, the warden of the transferor prison.  *Id*. at 919.  During

discovery, plaintiff asked for numerous documents, but never sought to learn which prison

officials were personally involved in his transfer.  After the warden denied any personal

knowledge of the transfer, his motion for summary judgment was granted on the grounds that the

plaintiff failed to state a claim of retaliation, that the warden was not personally involved in the

transfer, and that the warden was entitled to qualified immunity.  *Id*. at 920.  Davis appealed, and

the Court of Appeals appointed counsel for the appeal.

On appeal, the Court of Appeals for the Second Circuit held that the "problem with the resolution of Kelly's involvement is that it has been made prematurely" because the affidavits relied upon by the defendants denied personal knowledge about who transferred Davis and why. *Id.* at 920-21. While the court acknowledged that the defendant was not

> obligated at that point to provide the names of the officials who had carried out the transfer, since Davis had not asked for such names . . . Davis could not reasonably have been expected to understand prison transfer procedures or to be able to identify the officials involved. Moreover, without the assistance of an attorney, his failure to make the necessary inquiries is understandable.

*Id.* at 921.

Reversing the district court's grant of summary judgment, the court noted that "[i]n similar circumstances, courts have pointed out the appropriateness of maintaining supervisory personnel as defendants in lawsuits stating a colorable claim until the plaintiff has been afforded an opportunity through at least brief discovery to identify the subordinate officials who have personal liability." *Id.* (citing cases). The Court of Appeals for the Second Circuit went on to state that dismissal is "premature where the opportunity to identify those involved has not yet been accorded," and though Davis had the opportunity in this case, his failure was "understandable under the circumstances." *Id.* at 922. The court held that

> when a pro se plaintiff brings a colorable claim against supervisory personnel, and those supervisory personnel respond with a dispositive motion grounded in the plaintiff's failure to identify the individuals who were personally involved, under circumstances in which the plaintiff would not be expected to have that knowledge, dismissal should not occur without an opportunity for additional discovery.

*Id.*

Before deciding *Davis*, the Court of Appeals for the Second Circuit gave similar advice not to be quick to dismiss complaints of improper identification of a defendant in another civil rights case where a plaintiff, represented by counsel, sued Suffolk County and the police

commissioner for allegedly having a "municipal policy whose implementation infringed plaintiff's constitutional rights." *Oliveri v. Thompson*, 803 F.2d 1265, 1279 (2d Cir. 1986). Recognizing that "[t]hese types of claims against government entities and supervisors are frequently asserted in police misconduct cases," and that the claims appeared to be mere "boiler-plate," that

> [i]n view of the *strong policies favoring suits protecting the constitutional rights of citizens*, we think it would be inappropriate to require plaintiffs and their attorneys before commencing suit to obtain the detailed information needed to prove a pattern of supervisory misconduct in the form of inadequate training, improper policies, and toleration of unconstitutional actions by individual police officers. A plaintiff does not have to be prepared to meet a summary judgment motion as soon as the complaint is filed.

*Id.* (emphasis added). Though "neither the plaintiff nor his attorney is likely to know much about the relevant internal operations of the police department, nor about the disciplinary history and record of the particular police officers involved," and therefore would be hard-pressed to plead such claim with a solid factual foundation, those claims should still be allowed to proceed to discovery because "it is extremely unlikely that before formal discovery any citizen would or could be in possession of such information." *Id.*

Particularly pertinent to the present case is *Valentin v. Dinkins*, where the Court of Appeals for the Second Circuit "relaxed" the "general principle of tort law that a tort victim who cannot identify the tortfeasor cannot bring suit." 121 F.3d 72, 75 (2d Cir. 1997) (internal citation omitted). Valentin, who alleged he was accosted by police officers in violation of his civil rights, was incarcerated five months after the harassing incident for unrelated reasons, and remained incarcerated when he filed suit *pro se*. On the day the statute of limitations expired, he filed a complaint against, *inter alia*, "Donavan, N.Y.C. Police Dept.", describing in general terms when and by whom he was harassed. At a pre-trial conference, the Assistant Corporation

Counsel said that the information in the complaint was too vague to identify the defendant police officer, and that she "would not be able to do so without his shield number." *Id.* at 74. After the judge directed Valentin to provide a more detailed description of the police officer, he named the drug task force on which Donavan served, and stated that Donavan could be identified by "police incident reports associated with Criminal Docket Number 91–NO–95751 . . . in Criminal Court Part F." *Id.* He also appended interrogatories which stated the cross streets and time at which the incident took place, and asked "defendants to state '[w]hat officers/and or agents were in the area', as well as their rank, function, and identifying badge numbers.'" *Id.* The City did not answer these interrogatories, and the district court dismissed the complaint against Donavan because Valentin had "failed to provide defendant's attorney with a more detailed description." *Id.*

On appeal, Valentin's newly appointed *pro bono* counsel argued that the district court abused its discretion by not meeting its obligations assisting the plaintiff in discovery. *Id.* The Court of Appeals for the Second Circuit agreed with plaintiff's counsel.

> Valentin's case provides a paradigmatic example of why discovery may be necessary before a defendant may be fully identified. Valentin alleges that a police officer assaulted him, the file of the case was thereafter sealed, and he went to prison, apparently on unrelated charges, some five months later. From his place of incarceration, it is hard to see what investigative tools would be at his disposal to obtain further information on Donavan's identity.

*Id.* at 75. The information that the plaintiff did provide to the City was detailed enough that "at least some inquiry should have been made as to whether such an officer exists and could readily be located." *Id.* In agreeing with plaintiff's counsel, the court rejected the argument by the City that "plaintiff could have carried out the necessary research in the period prior to the sealing of the case and his incarceration." *Id.*

The rationale for the opinion of the Court of Appeals for the Second Circuit in *Valentin*, on its face, is not limited to cases where a plaintiff is proceeding *pro se*:

> The problem with the City's argument is that the statute of limitations in this action under 42 U.S.C. § 1983 is three years, not fifty-three days (the time between the incident and the sealing of the file) or five months (the time between the incident and Valentin's incarceration). The City offers no reason why Valentin was required to telescope his pre-complaint investigation into a shorter time frame than the statute permits.

*Id.* at 75-76.

Despite *Valentin's* rational applying to represented defendants, district courts have largely limited the case to the *pro se* context. *See, e.g.*, *Murray v. Pataki*, 378 F. App'x 50, 52 (2d Cir. 2010) (citing *Valentin* while holding that "[d]istrict courts have a responsibility to assists *pro se* plaintiffs in their efforts to serve process on defendants."); *Gill v. City of New York*, 15-CV-5513, 2017 WL 1097080, at *7 (E.D.N.Y. Mar. 23, 2017) (noting that in *Valentin*, "the Second Circuit made clear that a *pro se* litigant is entitled to assistance form the district court in identifying a defendant."). So-called "*Valentin* Orders"—where a district court orders an agency defendant to identify John Doe defendants based on information provided by the plaintiff—have also been largely confined to cases where the plaintiff is representing herself. *See, e.g.*, *Bishop v. City of New York*, 13-CV-9203, 2016 WL 4484245, at *1 (S.D.N.Y. Aug. 18, 2016) (describing the order issued by the court "instructing the City of New York to assist Bishop"—who was appearing *pro se*—"in identifying the John and Jane Doe officers."); *Dolce v. Suffolk County*, No. 12-CV-0108, 2014 WL 655371, at *1-2 (E.D.N.Y. Feb. 20, 2014) (discussing the issuance of a "*Valentin* order" in a Section 1983 action brought by a *pro se* plaintiff and the court's efforts to ensure compliance with the order).

Confining *Valentin* to cases where civil rights plaintiffs proceed *pro se* ignores the harsh realities faced by plaintiffs. *Valentin* focused on the difficultly for a *pro se* plaintiff in

performing a pre-complaint investigation and the obstacles one would face without the assistance of counsel.  The fact that a plaintiff is represented by counsel in a specific lawsuit does not mean that she was represented the entire time between the events giving rise to the lawsuit and the expiration of the statute of limitations, nor that the representation was adequate.  That concern applies with equal force to a civil rights plaintiff who retains counsel shortly prior to filing a complaint.

Limiting *Valentin's* scope to *pro se* litigants would also impermissibly afford *pro se* litigants greater rights than plaintiffs who retained counsel.  The theory behind affording *pro se* litigants "special solicitude" is to "protect *pro se* litigants from inadvertent forfeiture of important rights because of their lack of legal training"; it is often applied to shield unrepresented parties from a "harsh application of technical rules." *Traguth v. Zuck*, 710 F.2d 90, 95 (2d Cir. 1983).  The thrust of *Valentin* is the informational asymmetry between a civil rights plaintiff and the government.  This is not a technical rule; this is a function of the structural difference between an individual with limited tools at her disposal to investigate her government, and a municipal lawyer, who has at her disposal a much greater wealth of knowledge and sources of information about City agencies.  Representation by counsel does not in itself eliminate this disparity nor does it necessarily give rise to the inference that a plaintiff's interests are being adequately protected.  *See Wechsler v. R D Mgmt. Corp.*, 861 F. Supp. 1153, 1157 (E.D.N.Y. 1994) ("It is hardly an unwarranted leap in logic to extend the command of solicitude to a party represented by a less than adequate lawyer who has failed to plead an absolute defense or an incontrovertible cause of action.").

*Valentin*'s logic conflicts with the diligence gloss some courts have added to the relation-back of pleadings rules.  *See supra* Part IV(D).  A diligence requirement prior to running of

statute of limitations in effect creates a pseudo-statute of limitations that can vary widely, chancellor's foot-like in its discretion, and does not comport with the certainty and uniformity necessary to ensure Section 1983's twin goals of deterrence and compensation. In a similar context the Court of Appeals for the Second Circuit has realized that "where the facts are peculiarly within the possession and control of the defendant" the plaintiff may plead the facts "upon information and belief" and then utilize discovery procedures to support her allegations. *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010). *Valentin* is an extension of this principle where the name of a proper defendant is unknown to the plaintiff but can easily be obtained by the government.

### G. Ethical Obligations of Government Counsel

A lawyer working for a municipality has many clients. She directly represents the municipality, its agencies, and its employees whose actions might be imputed to their governmental employer. Often overlooked, but no less important, is the lawyer's representation of the resident of the municipality, whose votes and taxes guide and fund the government's activities. That representatives of the government are necessarily representatives of all the people is a hallmark of democratic governance. *See, e.g.*, Abraham Lincoln, The Gettysburg Address (Nov. 19, 1863) (urging that the American government remain a "government of the people, by the people, for the people"); The Federalist No. 22 (Alexander Hamilton) (Dec. 14, 1787) ("The fabric of American empire ought to rest on the solid basis of THE CONSENT OF THE PEOPLE. The streams of national power ought to flow immediately from that pure, original fountain of all legitimate authority.").

It is uncontroversial that a lawyer representing the government in the criminal context has a heightened ethical obligation that extends beyond just representing the narrow interests of

her most direct client; she also must endeavor to "do justice." *See, e.g.*, Model Rules of Prof'l Conduct R. 3.8 cmt. 1 (Am. Bar Ass'n 2017) ("A prosecutor has the responsibility of a minister of justice and not simply that of an advocate."). This "obligation" requires the prosecutor to take actions, such as disclosing exculpatory evidence, or to refrain from taking actions, such as prosecuting a charge that is not supported by probable cause. *See* Model Rules of Prof'l Conduct R. 3.8(a); 3.8(d) (Am. Bar Ass'n 2017). Some of these specific obligations are rooted in the constitutional rights of the defendants who are her nominal adversaries, though the demands of the Constitution are not an outer limit on the ethical obligations that may be imposed on the prosecutor. *See Kyles v. Whitley*, 514 U.S. 419, 437 (1995) ("We have never held that the Constitution demands an open file policy (however such a policy might work out in practice), and the rule in *Bagley* (and, hence, in *Brady*) requires less of the prosecution than the ABA Standards for Criminal Justice, which call generally for prosecutorial disclosures of any evidence tending to exculpate or mitigate.").

The origin of the prosecutor's general obligation to do justice is that she "is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done." *Berger v. United States*, 295 U.S. 78, 88 (1935). "He may prosecute with earnestness and vigor—indeed, he should do so. But while he may strike hard blows, he is not at liberty to strike foul ones." *Id.*

The rationale underlying the prosecutor's obligation to do justice—her representation "not of an ordinary party . . . but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all"—applies equally to attorneys who represent the

government in civil disputes. *See Freeport-McMoRan Oil & Gas Co. v. F.E.R.C.*, 962 F.2d 45, 47 (D.C. Cir. 1992) (holding that the principle in the Supreme Court's *Berger* decision that "government lawyers have obligations beyond those of private lawyers . . . appl[ies] with equal force to the government's civil lawyers."); *Judicial Notice and the Duty to Disclose Adverse Information*, 51 Iowa L. Rev. 807, 810 (1966) (a government attorney is in a "special position" because his "obligation to his specific client is tempered by the fact that he has a deeper obligation to the public, which his client represents, and to the enforcement of justice generally."); *see generally Zimmerman v. Schweiker*, 575 F. Supp. 1436, 1440 (E.D.N.Y. 1983) ("The ponderous machinery of the federal bureaucracy and United States Attorney's Office should not be turned implacably against them unless the government has first stopped to ask itself, 'Is opposing this claim just, is it fair, is there a reasonable basis for believing that the government can prevail on both the law and fact?'"); Jack B. Weinstein & Gay A. Crosthwait, *Some Reflections on Conflicts Between Government Attorneys and Clients*, 1 Touro L. Rev. 1, 18 (1985) (Federal Rules of Civil Procedure 11 and 37 "embody the special duty the public's lawyers, as litigators, owe to the judicial system not to burden the courts with unnecessary litigation. To comply with this obligation, they are expected to stipulate whenever possible, to avoid offering clearly unacceptable or inadmissible evidence, and to cooperate in supplying documents and in preparing impartial experts under Rule 706 [of the Federal Rules of Evidence]."); *id.* at 28 ("[W]hile compliance with executive policy should be the norm, a compelling need exists in this society—as in others that have come before it—to mitigate the harshness of the law through the individualization of justice. Responding with courage, compassion, and good sense in the individual case places the government attorney squarely within our highest ethical and philosophical traditions."); Judge Charles Fahy, *Special Ethical*

*Problems of Counsel for the Government*, 33 Fed. B.J. 331, 335 (1974) ("Where the client is the Government itself he who represents this vague entity often becomes its conscience, bearing a heavier responsibility than usually encountered by the lawyer."); Steven K. Berenson, *The Duty Defined: Specific Obligations That Follow from Civil Government Lawyers' General Duty to Serve the Public Interest*, 42 Brandeis L.J. 13, 31 (2003) ("[C]ourts will hold government attorneys to a higher standard that attorneys for private parties in refusing to countenance certain hardball litigation tactics, in light of government attorneys' broader duties to serve the public interest.") (internal punctuation omitted).

Unlike a private attorney, who can "attempt to get the best possible result [] from his single client's point of view," the "public attorney . . . is torn in a number of ways." Jack B. Weinstein, *Some Ethical and Political Problems of a Government Attorney*, 18 Me. L. Rev. 166, 169 (1966). Should a public attorney seek to pay the lowest sum possible in a condemnation proceeding? Should she use procedure to delay a meritorious case in an attempt to extract a favorable settlement? In tort cases, should the lawyers "t[ake] pride in getting the lowest possible settlements and in securing defendants' verdicts in close cases"? *Id.* at 169-70.

The public's attorney both represents "the many departments" of the municipality and "the people as well as government." *Id.* at 169. In the mid-1960s, an empirical study of the condemnation practices of Nassau County revealed that less than 16% of condemned properties received compensation commensurate with the lesser of two appraisals conducted by the county. Curtis J. Berger & Patrick J. Rohan, *The Nassau County Study: An Empirical Look Into the Practices of Condemnation*, 67 Colum. L. Rev. 430, 442 (1967). County residents were accepting such low sums in part because of ignorance about the value of the property. *Id.* at 445-46. Rather than accept this state of affairs—which was nominally beneficial for the county as an

entity unto itself—the Nassau County Attorney reformed the government's condemnation practices to ensure landowners were compensated fairly. *See id.* at 458 n.59 (describing reforms). These reforms were justified by the County Attorney's overarching representation of the people, which followed naturally from his representation of the government (which is, at its core, a representative of the people).

New York City's Corporation Counsel has recognized the dual obligation of the municipal attorney to both the institutional interests of the City and the City's residents. Corporation Counsel, Zachary Carter, on the Department's website states:

> The New York City Law Department is truly a great organization. It defends the institutional interests of the City and its constituent agencies, providing wise counsel on a wide array of legal issues. This Office prosecutes and defends lawsuits in the name of the City of New York, its agencies and citizens. Our work often involves being an adversary in litigation against an individual citizen or organization of the City. This presents a special obligation. *Not only must we vigorously advocate the legal position of the City, but we should never be indifferent to the fairness of the outcome and its impact.* That obligation should not be viewed as a burden. On the contrary, it is what makes the jobs of the individuals working in this office worth having.

Corporation Counsel's Message, http://www.nyc.gov/html/law/html/about/counsel-message.shtml (last visited Nov. 6, 2017) (emphasis added).

This dual obligation towards adversaries in litigation as well as to their client, the City, provides the government attorney with greater autonomy than her counterpart in private practice. The preamble to the Model Rules of Professional Conduct states that "[u]nder various legal provisions, including constitutional, statutory and common law, the responsibilities of government lawyers may include authority concerning legal matters that ordinarily reposes in the client in private client-lawyer relationships." Model Rules of Prof'l Conduct, Preamble & Scope ¶ 18 ((Am. Bar Ass'n 2017). An example from the preamble is: "a lawyer for a government agency may have authority on behalf of the government to decide upon settlement or whether to

appeal from an adverse judgment." *Id*. That this power resides with the lawyer and not the putative client is a product of the government lawyer not having an absolute obligation to the municipality's institutional interests in the way a private attorney does to her client.

Some courts and commentators have expounded less expansive views of the government lawyer's responsibilities. For example, in *Lybbert v. Grant County, State of Wash.*, 1 P.3d 1124, 1129 (Wash. 2000) (en banc), the court

> agree[d] with the basic proposition that the government should be just when dealing with its citizens, [but it did] not believe that an attorney representing the government has a duty to maintain a standards of conduct that is higher than that expected of an attorney for a private party.

The court held that the government lawyer did not have a higher ethical responsibility out of fear of a "two-tiered system of advocacy" and based on a principle formerly in the Preliminary Statement to the Rules of Professional Conduct that ethical rules "should be uniformly applied to all lawyers, *regardless of the nature of their professional activities*." *Id.* (emphasis in original). The Washington Supreme Court reversed the intermediate appellate court's conclusion that a government lawyer had the obligation to raise a service of process issue prior to the expiration of the statute of limitations. *Id*.

The *Lybbert* court's view does not accurately state the current understanding of the role of the government lawyer. A multi-tiered system of advocacy is deeply entrenched in the American legal system. It is beyond dispute that the prosecutor has a host of obligations above and beyond the private attorney. The preamble to the Model rules, as explained above, now also expressly recognizes that government lawyers have obligations and autonomy larger than the private attorney.

A former New York City Corporation Counsel, Michael Cardozo, has supported the position that government attorneys owe an obligation to only government institutional interests.

*See* Michael A. Cardozo, *The Conflicting Ethical, Legal, and Public Policy Obligations of the Government's Chief Legal Officer,* 22 J. Prof. Law. 4 (2014). Michael Cardozo recognizes that some "feel deeply uneasy whenever the government takes on a sympathetic citizen in court," but he believes that this is an "inevitable byproduct of the adversarial system through which the victim of an alleged wrong must seek compensation from the government." *Id*. at 8.

There is nothing inherent in an adversarial system that prevents the government from dealing justly with its citizens who have legitimate claims to compensation. A prosecutor too deals within an adversarial system but must put the interests of the citizenry and justice ahead of winning at all costs.

Supportive of Michael Cardozo's position, and relevant to this case, is the history of New York General City Law § 20(5), which provides that a city "shall have no power to waive the defense of the statute of limitations." The seeming harshness of this rule has been ameliorated by the New York Court of Appels. The Court has limited this rule by noting that

> [a]n agreement to extend the Statute of limitations is not truly a waiver unless it is made after the statutory period has run. Thus, as a general rule a party who has not raised the Statute of Limitations as a defense in the answer or by a motion to dismiss is held to have waived it. A city, as noted, lacks the power to waive the Statute of Limitations but is not otherwise precluded from granting an extension.

*John J. Kassner & Co. v. City of New York*, 389 N.E.2d 99, 103-04 (N.Y. 1979) (internal citations omitted).

The New York State Legislature's general view of the ethical obligations of a municipal lawyer supports flexibility. Directly before the clause about the statute of limitations, the General City Law expressly empowers a city "to pay or compromise claims equitably payable by the city, though not constituting obligations legally binding on it." N.Y. Gen. City Law § 20(5) (McKinney 2011). The rule as it pertains to waiver of the statute of limitations does not

encourage or permit a municipal attorney to stand as a barrier to a plaintiff filing a legitimate claim against a city.

## V.     Application of Law to Facts

The parties' dispute concerning the statute of limitations primarily focuses on whether Plaintiff's Proposed Second Amended Complaint, which he sought leave to file on January 9, 2017 and which adds a new defendant, Detective Tranchina, relates back to the filing of the Plaintiff's original complaint on September 5, 2015.  Defendants' do not contend that at the time of the filing of the original complaint, Plaintiff's malicious prosecution or municipal liability claims were untimely.  *See* Defs.' Opp'n Am. at 3, ECF No. 47.

### A.  Ethical Obligations of Counsel

The City of New York was alerted to Plaintiff's claim long before the filing of the original complaint.  Plaintiff filed a required Notice of Claim with the City.  A hearing pursuant to General Municipal Law Section 50-h was held on that claim on May 17, 2013.  From the 50-h Hearing it is clear that Plaintiff raised the same claims now brought in this lawsuit and did not know the identity of the officer who investigated the robbery for which he was arrested or the precinct in which the officer worked.  It is also clear that it was the robbery claim (of which Detective Tranchina was in charge) and not the homicide or escape charge (of which Detective Shapiro was in charge) that was in issue.

> [*By Counsel for Plaintiff*] These cases result from an absence of probable cause *for the prosecution for robbery*, and absence of due process rights, and other constitutional violations in terms of how he was dealt with in relation to all of the charges . . . .

> [*Counsel for the City*]: When were you *arrested for the robbery*?

> [Plaintiff]: April 2008.

*[Counsel for the City]: Who was the arresting officer for the April 2008 robbery charge?*

*[Plaintiff]: I don't know.*

[Counsel for the City]: Were you sent to a precinct at that time?

[Plaintiff]: Yes.

[Counsel for the City]: What precinct was that out of?

[Plaintiff]: I believe, the 104th precinct.

May 17, 2013 R. 50-h Hr'g Tr. 12:25-13:22, ECF No. 79, Ex. B (emphasis added).

While recognizing that the Corporation Counsel retained outside counsel to lead Plaintiff's 50-h hearing, the facts elicited in the hearing are attributable to the City's law department. Based on this knowledge, it was the Corporation Counsel's duty to bring to the attention of Plaintiff's counsel before the filing of the civil 1983 complaint in a clear way all of the documents and information that showed that Detective Tranchina should have been named as a defendant. *See The Duty Defined: Specific Obligations That Follow from Civil Government Lawyers' General Duty to Serve the Public Interest*, 42 Brandeis L.J. 13, 19 (2003) (reviewing cases and arguing that government attorneys have a quasi-Brady obligation in civil cases); *see also supra* Part IV(G). Although Plaintiff's original complaint was filed shortly before the expiration of the statute of limitations, the claim was not new to New York City. Plaintiff was not afforded the opportunity to file his initial complaint against the correct officer because the Corporation Counsel did not supply him with the necessary information to do so.

Instead of providing the necessary information to Plaintiff about the extent and nature of Detective Tranchina's involvement in the case Plaintiff was suing on, Defendants delayed the proceedings. Plaintiff originally filed this suit against Detective Shapiro and twenty "John and Jane Doe" police officers. *See* Compl. at 1. The Corporation Counsel's office, representing the

City of New York, did not immediately answer or seek to dismiss the Complaint. *See* Defs.'
Mot. Extension of Time to Answer, ECF No. 12. Instead the Corporation Counsel sought a
sixty-day extension of time in order to "acquire as much information as possible concerning this
matter in order to properly assess the case and respond to the Complaint." *Id.* at 1. On
December 4, 2015, the Corporation Counsel sought another extension of time to respond to the
complaint and represented that the "application d[id] not affect any other deadline in this case."
Defs.' Second Mot. Extension of Time to Answer at 1, ECF No. 14. Plaintiff consented to this
extension and it was granted. *Id.*; Dec. 7, 2015 Order. The Corporation Counsel sought a third
extension of time to answer the Complaint on February 3, 2016, and again, received the consent
of Plaintiff and represented that no deadlines in the case were affected by the application. *See*
Defs.' Third Mot. Extension of Time to Answer, ECF No. 16. This request, too, was granted on
consent. *See* Feb. 3, 2016 Order.

It was not until February 16, 2016, when Defendants filed a motion to dismiss the
complaint, that they responded to the original complaint. *See* Defs.' Mot. Dismiss, ECF No. 17.
Defendants' Answer was not filed until June 3, 2016. Answer, ECF No. 25. It took the
Corporation Counsel nearly nine months to answer the complaint.

Throughout the time between the filing of the original Complaint and the Defendants'
Answer, Detective Shapiro and twenty John and Jane Doe Officers were the only named
individual defendants in the case. The Corporation Counsel's office was conducting an
investigation of the allegations, with the consent of Plaintiff and the court, but Plaintiff was not
made aware that Detective Tranchina was the officer involved in the robbery case. Armed with
the knowledge that Plaintiff sued the wrong individual, Defendants sought to dismiss the
complaint. *See* Defs.' Mot. Dismiss, ECF No. 17, 18.

Plaintiff sought to depose Detective Tranchina after learning of his involvement in the case. While maintaining that Detective Tranchina should have been named as a defendant in the case, the Corporation Counsel sought to quash Plaintiff's subpoena to depose him. *See* Defs.' Mot. Quash, ECF No. 38; Pl.'s Resp. Mot. Quash, ECF No. 39. Finally, on December 23, 2016 Plaintiff deposed Detective Tranchina, and, after completing the deposition, he sought leave to amend his complaint to add Detective Tranchina on January 9, 2017. Pl.'s Mot. Am., ECF No. 46.

The Corporation Counsel's obligation to promptly provide Plaintiff with the identity of the correct officer does not stem solely from its ethical obligations, it is also derived from the discovery obligations explained by the Court of Appeals for the Second Circuit in *Valentin v. Dinkins* 121 F.3d 72, 75 (2d Cir. 1997), which applies in the present case. *See supra* Part IV(F). In *Valentin*, the plaintiff filed his complaint the day before the statute of limitations expired. While the Second Circuit Court of Appeals did not reach the question of whether an amended pleading would relate back under the Rule 15(c), it took a strong position that the district court and municipal attorney had an obligation to assist the plaintiff in identifying the officer involved in the case. *Id*. at 74-76.

For months the City sat in silence while a resident it serves had a readily curable defect in his complaint that the Corporation Counsel now claims deprives him of his right to have his claim adjudicated on the merits.

The Corporations Counsel did not adhere to its ethical and discovery obligations in this case. The Corporation Counsel has shown indifference to fairness of outcome and process. Because the Corporation Counsel has not complied with these obligations, it cannot assert the

statute of limitations as a defense. Its conduct substantially contributed to plaintiff's failure to name the proper defendant prior to the expiration of the statute of limitations.

### B. Leave to Amend Under Federal Rules 15 and 16

The court holds that Plaintiff demonstrated good cause in failing to add Detective Tranchina prior to the July 28, 2016 deadline for amending pleadings because of the dilatory tactics by Corporation Counsel. That Plaintiff waited until after deposing Detective Tranchina to amend his complaint should not be held against him. It was reasonable for Plaintiff to use the discovery devices available to ensure that he was naming the correct defendant, after mistakenly identifying the officer controlling the investigation. The burden on Defendants is minimal given that they delayed this case several times and were a cause of Plaintiff's failure to amend promptly. No prejudice is shown to the Corporation Counsel, the City, or Detective Tranchina, since the evidence in the case remains the same and all were aware of it from the beginning. Plaintiff may amend under Federal Rules of Civil Procedure 15 and 16.

### C. Relation Back Under Federal Rule 15(c)(1)(A)

The court holds that the amendment relates back to the original complaint under Federal Rule of Civil Procedure Rule 15(c)(1)(A) and this court's reading of the New York relation back statutes as interpreted by the New York Court of Appeals in *Buran v. Coupal*, 661 N.E.2d 978, 981 (N.Y. 1995). *See supra* Part IV(D)(1).

Plaintiff meets the three requirements articulated in *Buran*: (1) the claim arises out of the same conduct as articulated in the original complaint because the plaintiff's suit is still premised on the malicious prosecution of the same robbery; (2) the two parties share a "unity of interest" because the City must, and will voluntarily, indemnify Detective Tranchina; and (3) Detective Tranchina, and the City, by virtue of him being the lead detective on the robbery case giving rise

to this lawsuit, should have known that but for a mistaken identity the action would have been brought against him. Detective Tranchina has claimed that he did not learn of this lawsuit until November 2016, *see* Oct. 23, 2017 Hr'g Tr. 29:13-17, but given that the City was notified of the claim in May 2013, he should have been informed by the Corporation Counsel about the lawsuit at its inception. The court declines to apply the diligence gloss articulated by several federal and state courts, under the circumstances of the present case, for the reasons stated *supra* Part IV(D)(1).

Under New York State law, filing a complaint against a "John Doe" defendant because of ignorance of the proper party's identity is a "mistake in identity." *See Kirk v. University Ob-gyn Assoc.,* 104 A.D.3d 1192 (N.Y. App. Div. 2013); *see also supra* Part IV(D)(1)(b). The caption on Plaintiff's proposed Second Amended Complaint does not remove Detective Shapiro, but the facts and circumstances indicate that Detective Tranchina should be substituted for him since Detective Tranchina conducted the investigation related to Plaintiff's alleged unlawful robbery prosecution. Even if this was a "John and Jane Doe" case, it would still relate back under New York law. *Id.*

Because there has been no showing that Detective Shapiro had any involvement with the robbery investigation that forms the basis of this lawsuit, Plaintiff may amend his complaint to substitute Detective Tranchina for Detective Shapiro. This was a straightforward mistake in the identity of the proper officer.

### D. Relation Back Under Federal Rule 15(c)(1)(C)

Plaintiff's amended complaint also relates back under the federal standard. Under Rule 15(c)(1)(C) an amendment relates back when

> the amendment changes the party or the naming of the party against whom a claim is asserted, if Rule 15(c)(1)(B) is satisfied and if, within the period provided by

Rule 4(m) for serving the summons and complaint, the party to be brought in by amendment:

> (i) received such notice of the action that it will not be prejudiced in defending on the merits; and
>
> (ii) knew or should have known that the action would have been brought against it, but for a mistake concerning the proper party's identity.

Fed. R. Civ. P. 15(c)(1)(C).

As interpreted by the Supreme Court in *Krupski v. Costa Crociere S. p. A.*, 560 U.S. 538, 541 (2010), the focus of this inquiry is on a defendant's constructive or actual knowledge and the prejudice to the new defendant. *See supra* Part IV(D)(2). Here, as explained above, Detective Tranchina was the investigator of the robbery and shares the same attorney with the original Defendants in the lawsuit. Notice of the lawsuit is imputed to him on this basis. *See Berry v. Vill. of Millbrook*, No. 09-CV-4234 KMK, 2010 WL 3932289, at *5 n.6 (S.D.N.Y. Sept. 29, 2010) (holding that a newly added defendant was "not prejudiced because his attorney was or should have been aware, within the Rule 4(m) limitations period, that he would be named as a Defendant"); *Almeda v. City of New York*, No. 00-CV-1407 (FB), 2001 WL 868286, at *3 (E.D.N.Y. July 26, 2001) (holding that knowledge of a lawsuit could be imputed to a defendant where "Corporation Counsel should have known that [the new defendant] would be added to th[e] action when it received the original complaint").

The only issue left is whether Detective Tranchina "knew or should have known that the action would have been brought against [him], but for a mistake concerning the proper party's identity." Fed. R. Civ. P. 15(c)(1)(C)(ii). In *Krupski* the Supreme Court defined mistake as "[a]n error, misconception, or misunderstanding; an erroneous belief." 560 U.S. at 548. In the instant case, Plaintiff believed that Detective Shapiro led the investigation of the robbery charges against him, when in fact it was Detective Tranchina. This was clearly an erroneous belief, known to be erroneous by defense counsel. It is immaterial why he believed this. Detective

Tranchina was never misled; the Corporation Counsel should have informed him of his jeopardy as soon as the Section 50-h hearing was held.  *See supra* Parts V(A), (C).

The proper focus of the inquiry is on whether Detective Tranchina should have known that had there not been a mistake he would have been named in the complaint.  The Corporation Counsel should have informed Detective Tranchina at the inception—or before—the lawsuit about these claims against him.  The facts and circumstances of the case should have indicated to his potential attorney, the Corporation Counsel, that Detective Tranchina was the proper defendant, not Detective Shapiro.

## VI.    Conclusion

Plaintiff may amend his complaint to substitute Detective Tranchina for Detective Shapiro.  Plaintiff's claim against Detective Tranchina is timely under the governing statute of limitations.  The Corporation Counsel may not assert the statute of limitations as a defense; it did not adequately discharge its ethical and procedural duties to Plaintiff to disabuse him of his mistake.

The claim against Detective Tranchina relates back to the filing of the original complaint. Dismissing this claim on the basis of the statute of limitations would be inconsistent with *Valentin v. Dinkins* 121 F.3d 72, 75 (2d Cir. 1997), *Krupski v. Costa Crociere S. p. A.*, 560 U.S. 538, 541 (2010), and *Buran v. Coupal*, 661 N.E.2d 978, 981 (N.Y. 1995).

The court reserves judgement on Defendants' motion for Summary Judgement on other grounds.

SO ORDERED.


/s/ Jack B. Weinstein
Jack B. Weinstein
Senior United States District Judge

Dated:  November 8, 2017
          Brooklyn, New York